UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARLON PALMER,<br><br>Petitioner,<br><br>v.<br><br>TAMMY FOSS, Warden,<br><br>Respondent. | No.  2:19-cv-01999 KJN P<br><br><br>ORDER AND FINDINGS &<br>RECOMMENDATIONS |

I.  Introduction

Petitioner is a state prisoner, proceeding with counsel, with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2016 conviction for second degree murder.  Petitioner was sentenced to forty-five years to life in state prison.  Petitioner claims that he was denied the right to a fair trial when the trial court excluded evidence of third-party culpability and was denied his constitutional right against self-incrimination when the prosecutor argued that petitioner failed to testify and present evidence of his innocence.  After careful review of the record, this court concludes that the petition should be denied.

//

//

//

//

1

II.  <u>Procedural History</u>

On June 8, 2016, a jury found petitioner guilty of second-degree murder and not guilty of first-degree murder (Cal. Pen. Code, § 187(a)).  (ECF No. 8-1 at 140-42, 159; ECF No. 8-4 at 235-38.)[1]  On July 15, 2016, petitioner was sentenced to a total of forty-five years to life in state prison.  (ECF No. 8-1 at 214-15; ECF No. 8-4 at 258-62.)

Petitioner appealed the conviction to the California Court of Appeal, Third Appellate District.  (ECF No. 1 at 210-11; ECF Nos. 8-6 & 8-8.)  The Court of Appeal affirmed the conviction on April 30, 2018.  (ECF No. 8-9.)

Petitioner filed a petition for review in the California Supreme Court (ECF No. 8-10), which was denied on July 11, 2018 (ECF No. 8-11).

On September 26, 2019, petitioner filed a petition for writ of habeas corpus in the Sacramento County Superior Court.  (ECF No. 17 at 6-13.)[2]  The state superior court denied the petition in an order dated November 20, 2019.  (ECF Nos. 8-13.)

Thereafter, petitioner filed the instant petition on October 2, 2019.  (ECF No. 1.) Respondent filed an answer on December 10, 2019 (ECF No. 7) and petitioner filed a traverse on March 11, 2020 (ECF No. 16).

III.  <u>Facts</u>[3]

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual and procedural background:

> Defendant was found guilty of second degree murder for killing Hoa Ricky Tuyen (Hoa). Hoa owned a hydroponics supply store and sold

[1] "ECF" refers to this court's electronic case management and filing system.  Document number and specific page number references are to those electronically assigned at the time of filing or docketing.

[2] Petitioner argued a restitution fine was unconstitutional because an ability-to-pay determination was not made prior to imposition.

[3] The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in <u>People v. Palmer</u>, No. C082573 (4/30/18), a copy of which was lodged by respondent as Lodged Document 8-9 on December 20, 2019.

marijuana under the counter. He employed his brother, Luc Tuyen (Luc), and his sister's boyfriend, Thai Troung. Hoa arrived at his store on February 25, 2014, earlier than usual. Later that morning, one of Hoa's friends went to the shop to visit and found Hoa face down on some bags of soil. There were drops of blood on the floor near Hoa. The friend called 911 at 11:47 a.m. and an ambulance arrived within minutes. A police officer who responded to the 911 call and arrived when the paramedics were loading Hoa into the ambulance stated that Hoa appeared to be alive at that time. He followed the ambulance to the hospital where he observed some blood and bruising around Hoa's left ear. Hoa was pronounced dead at the hospital.

Hoa's hydroponics shop was very messy. Upon arrival, police could not determine whether Hoa died of natural causes or a homicide. Luc also thought the store was "messy," but "like [it had] been searched." He alerted police to a suspicious shoeprint on top of a box as well as some previously stacked items that were now toppled over. He also told officers that Hoa kept a cardboard box with a large amount of cash somewhere in the shop, but the officers could not locate such box. The shop's security camera had been disconnected for three weeks and was not in use that morning. The scene was suspicious enough that officers asked the hospital to "bag" Hoa's hands to preserve potential forensic evidence. The next day, the forensic pathologist for the Sacramento County Coroner's Office performed an autopsy and determined Hoa died of asphyxia due to neck compression. He also observed blunt force injuries to Hoa's head and extremities. The pathologist observed "blunt force injuries, abrasions and contusions on the left side of the face, and on the ear, and on the scalp under which there was hemorrhaging into the soft tissues. There were also some areas on the sides of the neck and anterior neck within the folds of the skin that were discolored." Hoa's knuckles were swollen, and he had a scrape on the back of his right hand. He had a bruise on the left side of his chin.

Four months after the murder, DNA samples from under Hoa's fingernails were tested and matched to defendant's DNA profile. Based on this DNA evidence, police were able to obtain a search warrant for defendant's cell phone records. The records showed that defendant's phone pinged a cell phone tower within a quarter of a mile of Hoa's shop at 9:16 a.m. and 9:39 a.m. on the day of the murder. Officers interviewed defendant on June 26, 2014, and asked him about his presence near the crime scene. He said that in February of that year, he worked at McDonald's seven days a week from 4:00 a.m. to noon. The detective told defendant he had cell phone records and other "evidence at the scene where this incident occurred ... [¶] ... [¶] that would make us believe that you were there." When asked if he had any reason to be in the area on February 25, 2014, defendant did not provide an explanation

Before trial, defendant filed a motion in limine to admit third-party culpability evidence. Defendant argued Luc, Hoa's employee and brother, and Truong, his employee and sister's boyfriend, both could have killed Hoa, either separately or together. Defendant moved to admit evidence of Truong's debts to Hoa and to a gambling

establishment. Defendant also moved to admit statements Luc purportedly made to police following the murder. In defendant's moving papers, he alleges that Luc "revealed that he knew that Hoa had been beaten before the information was released by the police." To support this claim, defendant pointed to the transcript of a different interview between Luc and the police detective that occurred two days after the murder.

The interview begins with the detective asking, "How is it that you found out that he was beaten to death?" Luc responded, "Uhm I think you told me." The detective replied, "No. We didn't know, and I had talked to you last week, we didn't know what happened." After saying another officer may have told him, Luc clarified that he learned of Hoa's injuries from his "sister and ... in-law," who were at the hospital before Luc. Luc's relatives told him that "it's a head trauma, someone was hit in the head—in the back of the head. They tried to revive him but couldn't." The transcript did not include the statement where Luc claimed to know that Hoa was beaten to death, only his response to a question asking how he learned of Hoa's cause of death.

Defendant argued Luc's statements to police regarding Hoa's injuries showed Luc attacked Hoa because only the attacker could have known the details of Hoa's injuries at the time of Luc's interview. Defendant also argued Luc was the murderer because Luc usually went to the store every day but was not seen there on the day of the murder, and Luc told officers Hoa kept a large amount of cash in the store.

Defendant argued Truong could have murdered Hoa because Truong owed Hoa $6,100 and had a $20,000 gambling debt, giving him a motive for robbery. The day before the murder, Truong withdrew $6,200. He claimed he repaid the $6,100 he owed Hoa, but defendant argued Truong was never able to produce a witness to the payment. Additionally, Truong answered a call from Hoa at 9:41 a.m. and Hoa answered a call from Truong at 9:43 a.m., two hours before Hoa's body was discovered, but denied talking to Hoa that morning when he was interviewed by police eight days after the murder. Finally, Truong also missed work at the hydroponics shop the day of the murder. Defendant argued the prosecutor produced no evidence to support Truong's alibi that he was at a prenatal appointment with his girlfriend on the day of the murder, and defendant had a right to question police about their failure to investigate.

The trial court discussed the standard of proof under Evidence Code section 352 (section 352) with counsel, and asked them to argue the probative value versus the prejudicial effect of the third-party culpability evidence. The judge reviewed the autopsy photos and discussed whether the injuries constituted a "beating" as Luc described in his initial interview with police (which is not in the record.) The judge viewed a video of Luc's interview with police twice and discussed the transcript with counsel. The prosecutor pointed out that police walked through the crime scene with Luc, so Luc saw the disorder in the shop and the drops of blood on the ground. Luc knew Hoa had been robbed before, so he could have

4

inferred Hoa was injured in a struggle. The judge acknowledged defendant had a right to ask police why they did not investigate Truong's alibi but told defendant he could not rely on speculation to introduce evidence. Court and counsel discussed whether Truong's withdrawal of $6,200 was exculpatory because it showed he intended to pay Hoa, or incriminating because the money was missing. They discussed the probative value of Truong's phone calls with Hoa the morning of the murder, and whether the calls created an alibi, i.e., Truong was somewhere else when Hoa was attacked. After carefully considering all of defendant's proposed third-party culpability evidence, the court denied defendant's motion in limine.

Following the close of evidence and defendant's closing argument, the prosecutor delivered his rebuttal argument. The prosecutor reminded the jury that defendant had failed to provide an explanation for his presence near the crime scene when he was interviewed by police. Defense counsel objected, arguing the prosecutor's statement constituted *Griffin* error. After overruling defendant's objection, the court admonished the jury as follows: "But again, keep in mind that the [d]efendant in a criminal case does not have to prove anything. Everyone understand that? Comments that [the prosecutor] is making are to be considered not that [d]efendant didn't produce evidence, but they're offered to—you can use them to rebut the argument from the [d]efense about door knobs [sic] and whatnot. You cannot consider that for [defendant] did not produce evidence [sic]. He does not have an obligation to produce evidence. Does everyone understand that? All right. All yeses. All right. Thank you."

(People v. Palmer, slip op. at *1-3.)

IV.  Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

5

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 132 S. Ct. 38, 44-45 (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)). Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (per curiam)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. Id. Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. Carey v. Musladin, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. [4] Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams v. Taylor, 529 U.S. at 413; Chia v. Cambra, 360 F.3d

---

[4]   Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Williams v. Taylor, 529 U.S. at 411.  See also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its 'independent review of the legal question,' is left with a '"firm conviction"' that the state court was '"erroneous"'").  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." Richter, 562 U.S. at 103.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims.  Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised").

The court looks to the last reasoned state court decision as the basis for the state court judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99.  This presumption

1    may be overcome by a showing "there is reason to think some other explanation for the state

2    court's decision is more likely." Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803

3    (1991)).  Similarly, when a state court decision on petitioner's claims rejects some claims but

4    does not expressly address a federal claim, a federal habeas court must presume, subject to

5    rebuttal, that the federal claim was adjudicated on the merits.  Johnson v. Williams, 568 U.S. 289,

6    298 (2013) (citing Richter, 562 U.S. at 98).  If a state court fails to adjudicate a component of the

7    petitioner's federal claim, the component is reviewed de novo in federal court.  Wiggins v. Smith,

8    539 U.S. 510, 534 (2003).

9            Where the state court reaches a decision on the merits but provides no reasoning to

10   support its conclusion, a federal habeas court independently reviews the record to determine

11   whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v.

12   Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo

13   review of the constitutional issue, but rather, the only method by which we can determine whether

14   a silent state court decision is objectively unreasonable."  Himes, 336 F.3d at 853.  Where no

15   reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

16   reasonable basis for the state court to deny relief."  Richter, 562 U.S. at 98.

17          A summary denial is presumed to be a denial on the merits of the petitioner's claims.

18   Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012).  While the federal court cannot analyze

19   just what the state court did when it issued a summary denial, the federal court must review the

20   state court record to determine whether there was any "reasonable basis for the state court to deny

21   relief."  Richter, 562 U.S. at 98.  This court "must determine what arguments or theories . . . could

22   have supported the state court's decision; and then it must ask whether it is possible fairminded

23   jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

24   decision of [the Supreme] Court."  Id. at 101.  The petitioner bears "the burden to demonstrate

25   that 'there was no reasonable basis for the state court to deny relief.'"  Walker v. Martel, 709 F.3d

26   925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

27          When it is clear, however, that a state court has not reached the merits of a petitioner's

28   claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

8

1    habeas court must review the claim de novo.  _Stanley_, 633 F.3d at 860; _Reynoso v. Giurbino_, 462

2    F.3d 1099, 1109 (9th Cir. 2006).

3    V.  _Petitioner's Claims_

4         A.  _The Exclusion of Third-Party Culpability Evidence_

5         Petitioner claims that his Sixth Amendment right to present evidence in his favor was

6    denied when the trial court excluded evidence of third-party culpability establishing Luc Tuyen

7    and Thai Truong killed Hoa Tuyen.  (ECF No. 1 at 15-25; ECF No. 16-1 at 4-5.)  Respondent

8    contends a fairminded jurist could agree with the state court's rejection of the claim, thus barring

9    relief in these proceedings.  (ECF No. 7 at 11-16.)

10        The last reasoned rejection of petitioner's first claim is the decision of the California

11   Court of Appeal for the Third Appellate District on petitioner's direct appeal.  The state court

12   addressed this claim as follows:

13
14   > _The Trial Court Did Not Abuse Its Discretion By Excluding_
>    _Defendant's Proposed Third–Party Culpability Evidence_

15
16   > Defendant argues the trial court erred under state and federal law by
>    denying his motion in limine to admit third-party culpability
>    evidence about Luc and Truong. We disagree.

17
18   > Third-party culpability evidence is admissible if it is capable of
>    raising a reasonable doubt as to the defendant's guilt. (_People v. Hall_
>    (1986) 41 Cal.3d 826, 833.) "[E]vidence of mere motive or
19   > opportunity to commit the crime in another person, without more,
>    will not suffice to raise a reasonable doubt about a defendant's guilt:
20   > there must be direct or circumstantial evidence linking the third
>    person to the actual perpetration of the crime." (_Ibid_.) All relevant
21   > evidence, including third-party culpability evidence, is subject to
>    section 352 balancing, which allows the court to exclude evidence
22   > where there is "a substantial danger of undue consumption of time or
>    of prejudicing, confusing, or misleading the jury." (_Hall_, at p. 829.)
23   > We review the trial court's decision to exclude evidence for abuse of
>    discretion. (_People v. Rodrigues_ (1994) 8 Cal.4th 1060, 1124
24   > ["[u]nder Evidence Code section 352, the trial court enjoys broad
>    discretion in assessing whether the probative value of particular
25   > evidence is outweighed by concerns of undue prejudice, confusion
>    or consumption of time"].)
26

27   > Defendant argues Luc's police interview wherein police question him
28   > about the source of his knowledge that Hoa was beaten to death was

9

relevant because it linked him to the actual perpetration of the murder. Specifically, defendant argues Luc's statements contained information only the murderer could have known. Defendant's argument has two problems. First, defendant assumes Luc's statements to police reflected his actual knowledge, when in fact the record shows the statements were speculative, and thus had limited probative value. Second, the probative value was further reduced because Luc's speculation about the cause of Hoa's death was inaccurate. Although Luc may have told police Hoa was involved in some sort of assault, a nonperpetrator could have made those statements given the condition of the shop and Hoa's body.

After Luc told police Hoa had been beaten, he clarified that he learned about Hoa's injuries from his sister. Luc explained, "So we was looking for where he's at, what hospital he went, but my sister was there already, they won't let us in. But my sister and my in-law saw what happened and is like yeah it's a head trauma, someone was hit in the head—in the back of the head. They tried to revive him but couldn't." Defendant argues that this explanation is not credible because "*it was not known* that Hoa had been the victim of foul play *until the day after Hoa's death after* [the autopsy.]" (Italics added.) The record, however, does not support this assertion. The police officer who followed Hoa's body to the hospital observed bruising around Hoa's ear at the hospital, supporting a finding of foul play before the autopsy was performed. Additionally, defendant argues that there is "only a mere possibility that [Luc] heard [about Hoa's cause of death] at the hospital because Dr. Hastings, the treating physician, didn't really know what was going on." Not so. Given Hoa's apparent physical injuries, it is possible Luc learned of Hoa's injuries at the hospital from the physician who examined Hoa, and that possibility reduces the probative weight of Luc's subsequent statement to police.

Further, Luc saw the messy state of Hoa's hydroponics shop when he walked through with the police. He also knew Hoa had been robbed before. As the prosecutor argued, Luc could have inferred a struggle took place from the messy state of the shop and his knowledge of past robberies. Taking these other circumstances into account, Luc's statements do not hold the probative weight defendant would have us assign to them.

Additionally, Luc's statement did not accurately describe Hoa's cause of death. Hoa was hit in the back of the head and then strangled to death, not beaten to death as Luc stated to police. Hoa had an abrasion on his forearm, injuries to his knuckles, and bruising and blood around his ear. The trial court did not find that the autopsy photos showed an extensive beating. The court stated, "So when I understand the term beating, I have in my mind that he was literally

10

beaten by some object, or hands, or something, and we would have bruising throughout the body, or the head and the face, or the upper body or whatever it is. These autopsy photos don't necessarily show [that]—." The detective who was assigned to investigate could not tell from the crime scene whether "it was a homicide or just a natural death." Another police officer to respond to the scene observed blood and bruising around Hoa's left ear at the hospital. Luc's statement that Hoa had been beaten did not implicate him in the perpetration of the crime because the crime was not perpetrated in the way Luc described. The record supports the conclusion that Hoa died by strangulation, not by beating. Thus, because Luc's statement did not show unique knowledge of the crime, to the extent the statements implicated him, the probative weight was minor.

The record also supports the trial court's finding that the probative weight of Luc's statement was substantially outweighed by its potential to confuse the jury. The statements do not connect Luc with the crime in a way that raises reasonable doubt as to defendant's guilt, potentially resulting in juror confusion. Without a clear link between Luc's statements and the commission of the crime, the jury would be left to guess at the relevance of evidence that Luc learned Hoa was beaten to death from his sister and in-law, when Hoa was not actually beaten to death. Thus, the trial court's decision to exclude the video of the interview with Luc was not arbitrary, capricious, or absurd. (*People v. Rodrigues, supra*, 8 Cal.4th at p. 1124.)

Likewise, the trial court did not abuse its discretion by excluding evidence of Truong's debts. Truong had a $20,000 gambling debt and owed Hoa $6,100. He withdrew $6,200 the day before the murder and claimed he repaid Hoa in front of a witness, but he never produced the witness. Both debts may provide motive, but do not connect Truong to the actual perpetration of the murder. Nothing about Truong's debts places him at the hydroponics shop on February 25. The evidence only speaks to motive. Without other direct or circumstantial evidence connecting Truong to the "actual perpetration of the crime," the evidence of motive is inadmissible. (*People v. Hall, supra*, 41 Cal.3d at p. 833.)

Defendant argues that other evidence links Truong to Hoa's murder and makes his debts admissible third-party culpability evidence. Not so. Truong was the last person to talk to Hoa, but Truong was Hoa's employee and he was dating Hoa's sister, so his phone calls were not suspicious. Without more, Truong's two phone calls with Hoa on the morning of the murder do not connect Truong to the perpetration of the crime. They merely establish Truong knew and spoke to Hoa.

Defendant also points to Truong's absence from work on the day of the murder. He claims Truong's alibi that he was taking his girlfriend

to a prenatal doctor's appointment could have been untrue. This argument only goes to Truong's opportunity to commit the crime. Like the evidence of motive, third-party culpability evidence showing opportunity is not admissible without other evidence tying the defendant to the crime. (*People v. Hall, supra*, 41 Cal.3d at p. 833.) Speculation that Truong was lying about his alibi, without more, does not connect him to Hoa's murder. Instead, defendant highlighted an area of the prosecution's case that lacked full investigation. Defendant had the opportunity to cross-examine police detectives on this issue during the trial. Given the trial court's careful consideration of the evidence and the parties' arguments, this record does not show it abused its discretion when it found that the proposed evidence did not create reasonable doubt as to defendant's guilt.

Defendant argues the trial court's reliance on *Hall* violated the California Constitution because the holding in *Hall*—that third-party culpability evidence must show more than just motive and opportunity—results in the exclusion of relevant evidence. (*People v. Hall, supra*, 41 Cal.3d at p. 833.) Article 1, Section 28, subdivision (f)(2) of the California Constitution (the "Right to Truth-in-Evidence") prohibits, with some exceptions, the exclusion of relevant evidence in criminal proceedings. One of those exceptions is section 352. (Cal. Const., art. I, § 28, subd. (f)(2).) *Hall* holds that third-party culpability evidence is a class of evidence just like any other, and if relevant, should be admitted subject to section 352 balancing. (*Hall*, at p. 834 ["courts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible (§ 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion (§ 352)"].)

In this context, our Supreme Court was simply applying section 352 when it adopted the "mere motive or opportunity" rule. (*People v. Hall, supra,* 41 Cal.3d at p. 833.) A trial court has discretion under section 352 to exclude evidence of motive or opportunity that is so speculative it might delay, prejudice, or confuse a trial by implicating numerous third parties otherwise unconnected to the crime. (Hall, at p. 834 [rejecting defendant's claim that section 352 violated his right under the California Constitution to present a defense when third-party culpability evidence only showed motive].) *Hall* does not improperly limit the court's discretion to admit relevant third-party culpability evidence that would otherwise be mandated by the California Constitution because the discretion described by Hall was conferred upon the courts by section 352. (*Hall*, at p. 834.) Thus, the trial court did not violate defendant's right to truth-in-evidence.

Finally, defendant claims the court violated his Fourteenth Amendment right to due process and his Sixth Amendment rights to

12

1
2
3
4
5
6
7
8

a jury trial, to confront witnesses, and to present a defense by excluding his proposed third-party culpability evidence. The federal Constitution gives trial court judges the discretion to exclude evidence if its probative value is outweighed by its prejudicial effect. (*Holmes v. South Carolina* (2006) 547 U.S. 319, 326 [164 L.Ed.2d 503, 510] ["well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury"].) Exercise of discretion only violates due process if a judge's error makes the trial fundamentally unfair. (*People v. Partida* (2005) 37 Cal.4th 428, 439.) As discussed above, we conclude the trial court did not err in balancing the evidence, so there is no due process violation.

9   (People v. Palmer, slip op. at *3-5.)

10                          Legal Standards Applicable to the Claim

11   Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in

12   the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution

13   guarantees criminal defendants "a meaningful opportunity to present a complete defense" and the

14   right to present relevant evidence in their own defense.  Holmes v. South Carolina, 547 U.S. 319,

15   324 (2006) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)).

16   However, the United States Supreme Court has not "squarely addressed" whether a state

17   court's exercise of discretion to exclude testimony violates a criminal defendant's right to present

18   relevant evidence.  Moses v. Payne, 555 F.3d 742, 758-59 (9th Cir. 2009).  Nor has the Supreme

19   Court clearly established a "controlling legal standard" for evaluating discretionary decisions to

20   exclude the type of evidence at issue here.  Id. at 758.

21   Evidence of potential third-party culpability must be admitted when, under the "facts and

22   circumstances" of the individual case, its exclusion would deprive the defendant of a fair trial.

23   Thus, in Chambers v. Mississippi, 410 U.S. 284, 303 (1973), exclusion of evidence of a third-

24   party confession was found to violate due process where the excluded evidence was highly

25   corroborated, and the excluded testimony was crucial to the defense.  Likewise, in Lunbery v.

26   Hornbeak, 605 F.3d 754, 760-61 (9th Cir. 2010), the exclusion of a statement by a third-party that

27   he had killed defendant's husband deprived defendant of the right to present a defense because the

28

1   "excluded testimony ... bore substantial guarantees of trustworthiness and was critical to

2   [defendant's] defense."  Conversely, where the proffered evidence of third-party culpability

3   simply affords a possible ground of suspicion pointing to a third-party and does not directly

4   connect that person with the actual commission of the crime, that evidence may be properly

5   excluded.  People of Territory of Guam v. Ignacio, 10 F.3d 608, 615 (9th Cir. 1993) (citing Perry

6   v. Rushen, 713 F.2d 1447, 1449 (9th Cir. 1983)).

7          "A defendant's right to present relevant evidence is not unlimited, but rather is subject to

8   reasonable restrictions," such as evidentiary and procedural rules.  United States v. Scheffer, 523

9   U.S. 303, 308 (1998).  In fact, "state and federal rulemakers have broad latitude under the

10  Constitution to establish rules excluding evidence from criminal trials," id., and the Supreme

11  Court has indicated its approval of "well-established rules of evidence [that] permit trial judges to

12  exclude evidence if its probative value is outweighed by certain other factors such as unfair

13  prejudice, confusion of the issues, or potential to mislead the jury," Holmes v. South Carolina,

14  547 U.S. at 326.  Evidentiary rules do not violate a defendant's constitutional rights unless they

15  "infring[e] upon a weighty interest of the accused and are arbitrary or disproportionate to the

16  purposes they are designed to serve."  Id. at 324 (alteration in original) (internal quotation marks

17  omitted); see also Scheffer, 523 U.S. at 315 (explaining that the exclusion of evidence pursuant to

18  a state evidentiary rule is unconstitutional only where it "significantly undermined fundamental

19  elements of the accused's defense").  In general, it has taken "unusually compelling

20  circumstances . . . to outweigh the strong state interest in administration of its trials."  Perry v.

21  Rushen, 713 F.2d at 1452.

22                          Relevant Background

23          The issue of third-party culpability was argued at the motions in limine hearing;

24  specifically, petitioner's motion in limine number one and the prosecution's motion in limine

25  number three.  (ECF No. 8-3 at 16; see also ECF No. 8-1 at 84, 91-95.)

26          Defense counsel argued that two individuals – the victim's brother Luc Tuyen and the

27  victim's claimed brother-in-law Thai Truong – were culpable in the victim's death.  More

28  particularly, as to the victim's brother Luc, counsel argued circumstantial evidence of third-party

14

culpability existed due to Luc's response to a question posed by a detective, indicating knowledge of the victim having been beaten at a time Luc should not have had such knowledge, coupled with the fact Luc was conveniently absent from work on the date of the murder, claiming he was home ill.  (ECF No. 8-3 at 16 ["Luc appears to know of a fact that the victim was apparently beaten that he - - that he should not know at that point in time when he's interviewed"], 17 ["And Luc was mysteriously absent that day" & a "witness . . . will testify that it's very unusual for him not to be at work that day"] , 21-22, 23 ["It's just that he knew he had been assaulted"], 25 ["Luc said that he went - - I think he was ill that day, so he was at home"], 27 ["it's that he knew he didn't die of natural causes" & "how would he even know this was a crime?  How did he - - how does he know there was an assault, assaultive behavior?  In other words, at this point he shouldn't know that it wasn't anything other than a medical emergency"], 38 ["he specifically states that the reason he wasn't there that day because he was ill.  I take that to mean that if he wasn't ill, he would be there"].)

As to brother-in-law Truong, defense counsel argued circumstantial evidence of third-party culpability existed due to Truong's gambling debt owed to the victim, Truong's denial of having spoken with the victim by telephone on the date of the murder and an unverified alibi of having taken his pregnant wife to the hospital for an appointment.  (ECF No. 8-3 at 18 ["He is also at the business on a daily basis, but apparently conveniently he was not there the day of the offense.  He denied talking with the victim" & "He denied it"], 19 ["He claims he paid the victim back" before the murder but in absence of any corroboration], 34, 39 ["Mr. Truong explained he was not present at the business because he was purportedly taking the victim's sister … to a medical appointment because … she was expecting" & "He indicated that he hadn't talked to the victim that day at all" despite a detective finding "two completed calls that morning" between Truong and the victim], 40 ["the third-party culpability evidence with regard to Thai really appears to be more that here he is caught in a lie.  He did communicate with him that day, and he has substantial motive, and it's somewhat convenient that he claims, well, I paid him the debt right before the homicide"], 41 [Truong "says he paid" the debt "but that is - - it's speculative that it was actually paid.  He did make a withdraw from the bank of the amount of money that he said

15

1    he paid back to the victim"], 46-47 [Truong "says there was a witness to him paying the money

2    back. And he's extremely evasive about this" & only knew a nickname and never contacted the

3    detective with name or location of the individual].)  (See also ECF No. 8-3 at 20 ["suspiciously

4    both Thai and Luc that day claim to have not been at that store when they were there every day

5    according to the neighboring business owner"], 24 [Luc "says he was sick on this day . . . that's

6    somewhat telling or convenient if you will for him to choose that day not to be present, the same

7    day that Thai Truong says that he's not present"], 37-38 [Luc "explained to Detective Dedonder

8    that he was ill that day and stayed home.  And of course, Defense theory is that that's sort of a

9    self-created alibi that he was conveniently not there as well as his brother-in-law, Thai Truong,

10   was not that that day" & "They're usually both there each day"], 40 ["Luc and Thai really don't

11   have - - Luc and Mr. Truong really don't have an explanation why they were both out at the same

12   time"], 51 ["it appears from my perspective that it's - - that Luc and Thai are acting in concert,

13   that it's combined"].)

14          The prosecution argued the evidence of third-party culpability did not meet the standards

15   required.  More particularly, as to Luc, the conversation with the detective occurred two days

16   after the victim's murder and Luc had previously walked through the crime scene with detectives

17   and noted a struggle, then had conversations with others at the hospital where his brother was

18   taken for treatment trying to learn what had happened, understood the victim to have been beaten,

19   ultimately learning after an autopsy that the victim died of strangulation.  (ECF No. 8-3 at 30

20   ["To have the brother say that he thought his victim brother was beaten two days later when he

21   talks to the detective … that doesn't add any value because in those two days, that victim brother

22   has not only been to the scene of the crime and walked through the scene with the detective to try

23   and ascertain what was taken, what wasn't, he noted that boxes had been on the ground, knocked

24   over, which would lead that … brother, Luc, to believe that there was some sort of struggle. There

25   was blood …"], 31 ["There's a lot of chaos going on.  There's a lot of family members … that

26   went to that hospital, and everybody is talking and trying to figure it out. The doctors at the

27   hospital did not know what caused the death" & Luc did "not say that my brother was killed by

28   some armbar asphyxiation.  He said he was beaten, which is totally wrong"], 39 ["he says: My

16

sister and my sister-in-law saw what happened, and it's, like, head trauma. Someone was hit in the back of the head. … So he's telling us right there where he got some information from, which is the whole point, that he got it from multiple sources"].)

As to Thai Truong, the prosecution indicated a bank statement evidences a withdrawal of $6,200 a day prior to the murder that would corroborate Truong's statement that he paid the victim the debt owed, and that Truong did not say he did not talk to the victim on the date of the murder; rather, Truong indicated he did not remember if he spoke to the victim on that day when asked at a later date.  (ECF No. 8-3 at 41 [reference to bank statement produced by the people], 43 [re the phone calls, Truong "doesn't remember it.  There's a difference"], 44 ["there was an outgoing phone call" from Truong to the victim "at 9:41 am outgoing for 35 seconds.  Two minutes later an incoming back for 16 seconds from victim's phone number" & "the victim used his phone at 9:43 for 16 seconds"], 48 [Truong "withdraws 6,200 the day before the murder"], 48-49 [Truong "said I don't remember, so let's just put it in his own words, I don't remember"], 49-51.)

After hearing significant argument to the court, and viewing a video clip and reviewing accompanying transcripts offered by the defense (ECF No. 8-3 at 16-53), the trial court ruled as follows:

> Okay.  On third-party culpability, Defense Motion No. 1 is denied.  People's Motion No. 3 is granted.  Having weighed the proffered what both sides believe the evidence would be, given my value of it, I don't believe the probative value would run to raise a reasonable doubt as to the Defendant's guilt.  In fact, I think that the prejudicial effect, probative value is - - you would have to stretch it to find significant probative value.  I tried to dissect it piece by piece, analyze it piece by piece, and analyze it cumulatively.  Hopefully the record reflects that.
>
> Looking at it in its totality, I did view the video.  I'm not convinced that the video shows such furtive movements, or nervousness, or really showing, in essence, kind of a consciousness of guilt or evasion of Luc when I watched the video. As a whole, I think that the probative value of the evidence individually, and separate and cumulatively, that is to say, Luc alone, Truong alone and both of them together, and then each of them separately, the elements of Luc, separate, the elements of Truong separate, the elements of Truong together and all together, putting it all together, the probative value is substantially outweighed by the possibility of both confusion to the jury and misleading the jury.  For that reason, the - - again, the

17

1    Defense motion to include third-party culpability is denied.  People's
     request to exclude is granted.

2

3    (ECF No. 8-3 at 53-54.)[5]

4              Analysis

5         The Third District Court of Appeal's denial of petitioner's claim was neither contrary to,

6    nor did it involve an unreasonable application of, Supreme Court precedent.

7         First, the undersigned finds the decision - that the trial court did not violate petitioner's

8    federal constitutional rights by excluding proffered evidence of third-party culpability - is not

9    contrary to or an unreasonable application of clearly established federal law because the Supreme

10   Court has not squarely established precedent on the issue.  See Knowles v. Mirzayance, 556 U.S.

11   111, 112 (2009) ("it is not an unreasonable application of 'clearly established Federal law' for a

12   state court to decline to apply a specific legal rule that has not been squarely established by [the

13   United States Supreme Court]"); Wright v. Van Patten, 552 U.S. 120, 126 (2008) (relief is

14   "unauthorized" under § 2254(d)(1) when the Supreme Court's decisions "give no clear answer to

15   the question presented, let alone one in [the petitioner's] favor," because the state court cannot be

16   _____

[5] The following day, just prior to selecting a jury, the following colloquy occurred:

17        MR. CAMERON:  Yes, Your Honor.  Regarding my motion to admit
          third-party culpability evidence, I also wanted to state my motion on
18        some federal grounds, and that is my client's federal due process
          right to have the Court follow its own - - its own state authorities as
19        well as the fundamental fairness prong of due process.  And I would
          cite the due process clause of the Fifth Amendment incorporated by
20        the 14th Amendment, as well as the case Hicks versus Oklahoma, 447
          US 343.  And I submit it, Your Honor.
21

22        THE COURT:  Thank you.  And Mr. Smith, do you wish to be heard
          at all?

23        MR. SMITH:  No, Your Honor.

24        THE COURT:  All right.  Thank you.  The request to federalize, that
          is to say, to treat any ruling - - that the rulings that I have made on
25        the third-party culpability yesterday both under state law and under
          federal law is granted. So that if the matter is reviewed, it can be
26        reviewed under or will be reviewed under both state and federal
          including this Court's requirement to follow its own and also to
27        honor the Fifth Amendment of the US Constitution.

28   (ECF No. 8-3 at 78-79.)

                              18

1   said to have unreasonably applied clearly established federal law); Moses v. Payne, 555 F.3d at

2   758-59; Brown v. Horell, 644 F.3d 969, 983 (9th Cir. 2011) ("Between the issuance of *Moses* and

3   the present, the Supreme Court has not decided any case either 'squarely address[ing]' the

4   discretionary exclusion of evidence and the right to present a complete defense or 'establish[ing]

5   a controlling legal standard' for evaluating such exclusions").

6        Even setting aside the issue of clearly established federal law, relief is unwarranted.

7        Although the exclusion of trustworthy and necessary exculpatory evidence violates due

8   process, the proffered evidence here was nothing more than speculation; there was no direct or

9   circumstantial evidence linking Luc and/or Truong to the murder of Hoa Tuyen.  As referenced

10  above, this record establishes the evidence proffered by petitioner in support of his third-party

11  culpability claim was speculative and lacking any link to the victim's murder over and above that

12  speculation.  People of Territory of Guam v. Ignacio, 10 F.3d at 615.  The proffered evidence

13  may have been crucial to the defense in the sense identity of the murderer was key, but the

14  proffers were not highly corroborated.  Chambers v. Mississippi, 410 U.S. at 303.

15       Two days after his brother's murder, Luc was asked by Detective Dedonder how it was

16  that Luc learned his brother "was beaten death;" Luc indicated he thought Dedonder had told him

17  so.  (ECF No. 8-1 at 261.)  When the detective denied doing so, and indicated that when he had

18  spoken with Luc the previous week the detective did not yet know what had happened; Luc

19  replied, "Oh, oh, oh, did it - - I think it was this one officer told me that  - - he was (inaudible) a

20  crime and - -."  (Id.)  Luc agreed that Dedonder told him his brother had died, and that later after

21  learning what hospital his brother had been taken to, but being denied admittance himself, his

22  "sister" and "in-law saw what happened and is like yeah it's a head trauma, someone was hit in

23  the head - - in the back of the head.  They tried to revive him but he couldn't."  (ECF No. 8-1 at

24  262.)

25       Luc's statement to Detective Dedonder referenced his brother's death as the result of a

26  *beating*; it made no mention of the victim's actual *cause of death*, to wit: *asphyxia* due to neck

27  ////

28  ////

1    compression (see ECF No. 8-4 at 97), commonly referred to as strangulation.[6]  While the cause of

2    death was not known until the autopsy had been performed, information indicating the victim had

3    suffered external injuries was known to involved law enforcement prior to the autopsy.  (ECF No.

4    8-3 at 158-59 [Dedonder testified an officer was sent to hospital to gather information from the

5    doctors as to cause of victim's death] & 188 [Officer Barnes testified he personally observed

6    blood inside victim's left ear and bruising behind the left ear while at the hospital shortly after

7    victim expired]).  Moreover, on the date of the murder, Luc walked through the crime scene with

8    law enforcement and noted his brother's store "was messy" as if a fight had occurred inside.

9    (ECF No. 8-3 at 122-23; see also ECF No. 8-3 at 143-44 [Dedonder testified Luc advised him on

10   the date of the murder the area looked disturbed] & 147 [Dedonder: suspicious circumstances

11   warranted asking CSI to bag victim's hands].)  Between the messy store Luc observed on the date

12   of his brother's death and the information he was told by relatives,[7] a fairminded jurist could

13   readily conclude that Luc's statement that his brother was "beaten to death" was in no way

14   corroborated and did not serve to violate petitioner's due process rights to present trustworthy

15   exculpatory evidence.

16        Also, petitioner's argument requires a reviewing court to adopt the position that Luc's

17   statement that his brother was "beaten to death" is synonymous with the actual cause behind the

18   victim's death.  In fact, Hoa Tuyen was asphyxiated, or strangled, to death.

19        The fact Luc was not present and working at his brother's store on the date of the murder,

20   coupled with his statement or statements to Detective Dedonder, does not amount to trustworthy,

21   corroborated, exculpatory evidence.  Like Ignacio, petitioner's proffered evidence simply affords

22   possible suspicion pointing to a third-party in the absence of any direct connection to the actual

23   _____

24   [6] The coroner testified he found petechial hemorrhages in the victim's eyes, a sign of
     asphyxiation or strangulation.  (ECF No. 8-4 at 95-96.)  He further testified that "there was

25   evidence of neck compression with compression onto the larynx and onto that hyoid bone, and
     hemorrhaging into those strap muscles, those neck muscles on the anterior of the larynx."  (ECF

26   No. 8-4 at 96.)

27   [7] See also ECF No. 8-4 at 86-93 [external signs of injury at autopsy included abrasions,
     contusions and swelling to the face, ear, neck, hands, and forearm]).

28

commission of the crime.  People of the Territory of Guam v. Ignacio, 10 F.3d at 615 (third-party culpability proffer that victim's mother's boyfriend was guilty party because he committed suicide three months after crime and that he occasionally spent the night at the household and had urged victim's mother to pursue charges against petitioner "together did not constitute 'substantial evidence' tending to directly connect the boyfriend with the actual crime).

The same can be said of the alleged third-party culpability by Thai Truong.  As indicated in the excerpts above, petitioner's evidence is nothing more than speculation or evidence in the absence of corroboration.  Petitioner found it suspicious Truong was not at the victim's store on the date of the murder. Truong however had indicated to investigators that he was not present on that date because he took his wife/girlfriend – the victim's sister – to a medical appointment related to her pregnancy.  And as far as petitioner's argument concerning Truong's gambling debts providing a motive for Truong to murder the victim, there existed a bank statement evidencing a sizeable cash withdrawal from Truong's account the day prior to the date Truong indicates he repaid the victim the sum he had previously borrowed.  The motive assigned to Truong by petitioner was therefore speculative and uncorroborated.  It too merely afforded possible suspicion pointing to a third-party in the absence of any direct connection to the actual commission of the crime.  People of the Territory of Guam v. Ignacio, 10 F.3d at 615.

Petitioner's proffer would have only shown that neither Luc nor Truong were present at the victim's store on the date of the murder despite their typical presence, that Luc stated a belief that his brother had been beaten to death rather than strangulation, and that Truong owed a debt to Hoa where there existed documentary evidence tending to show the debt had been paid but in the absence of corroboration by a third individual, and that Truong did not remember whether he had spoken with Truong on the telephone on the date of the murder.  At most, the evidence provided opportunity as to Luc and Truong, and motive as to Truong. But it did not sufficiently link either to Hoa's murder.  Holmes v. South Carolina, 547 U.S. at 327 (exclusion appropriate where third-party culpability evidence does not sufficiently connect the other person to the crime); United States v. Vallejo, 237 F.3d 1008, 1023 (9th Cir. 2001) (holding that third party culpability evidence is only admissible if it tends to prove that a person other than the defendant committed

1   the charged crime); Spivey v. Rocha, 194 F.3d 971, 978 (9th Cir. 1999) ("there must be direct or

2   circumstantial evidence linking the third person to the actual perpetration of the crime").

3        The decision of the California Court of Appeal is not "so lacking in justification that there

4   was an error well understood and comprehended in existing law beyond any possibility for

5   fairminded disagreement." Richter, 562 U.S. at 103.  Under the circumstances of this case,

6   petitioner has not met his "heavy" burden to show a due process violation resulting from the trial

7   court's decision to exclude the alleged third-party culpability evidence.

8        Assuming arguendo that the trial court's exclusion of this evidence was constitutional

9   error, the error could not have had a "substantial and injurious effect or influence in determining

10  the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).

11       Despite petitioner's characterizations of the evidence against him as "only tenuous" (ECF

12  No. 1 at 21), that there was "almost no evidence that [he] was the perpetrator" (ECF No. 1 at 24)

13  and that the "case was shaky" (ECF No. 1 at 25), the undersigned disagrees.  The undersigned has

14  carefully reviewed the record.  The prosecution's case rested not only on the cell phone data

15  establishing petitioner's presence near the crime scene and the fact petitioner's DNA was found

16  under the victim's fingernails, but on petitioner's denial during an interview with detectives that

17  he was even in the area at the time of the murder.  (ECF No. 8-3 at 172, 173.)  The videotape of

18  that interview was played for the jury.  (ECF No. 8-3 at 157; see also ECF No. 8-1 at 242-60

19  [transcript].)  Given the inculpatory evidence amassed at trial against petitioner, even had the trial

20  court erred, the error would not have had a substantial and injurious effect on the jury's verdict.

21  Brecht, 507 U.S. at 623.

22       In sum, the state court's decision was not contrary to, or an unreasonable application of,

23  clearly established Supreme Court authority.  28 U.S.C. § 2254(d).  Thus, the undersigned

24  recommends this claim be denied.

25       B.  *Griffin* Error

26       Petitioner claims that his Fifth Amendment rights were violated by the prosecutor's

27  argument to the jury that petitioner failed to explain why he was near the victim's shop around the

28  time he was murdered.  (ECF No. 1 at 25-30; ECF No. 16-1 at 5-6.)  Respondent maintains the

1  state court reasonably rejected the claim, foreclosing relief in these proceedings.  (ECF No. 7 at

2  16-19.)

3        The last reasoned rejection of petitioner's claim is the decision of the California Court of

4  Appeal for the Third Appellate District on petitioner's direct appeal.  The state court addressed

5  this claim as follows:

6        *The Prosecutor Did Not Argue Defendant's Failure To Testify In His*

7        *Own Defense Was Evidence Of Defendant's Guilt*

8        Defendant argues the prosecutor violated his federal Fifth

9  Amendment constitutional rights during closing argument by
suggesting his failure to testify about the reason he was near the

10  hydroponics shop within the time frame of the murder demonstrated
his guilt. We do not agree with defendant that the prosecutor referred

11  to his failure to testify, and thus conclude the jury was not reasonably
likely to interpret the prosecutor's comments in such a manner.

12  Accordingly, we reject defendant's claim.

13  The Fifth Amendment bars the prosecutor from commenting on a
defendant's failure to testify in his own defense. (*Griffin v.*

14  *California, supra,* 380 U.S. at pp. 613–614 [14 L.Ed.2d. at p.109].)
If the defendant is the only one who can contradict certain evidence,

15  then commenting on the defendant's failure to do so can constitute
error. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1339; cf. *People*

16  *v. Hughes* (2002) 27 Cal.4th 287, 371 [stating *Griffin* error occurs
when the prosecutor describes the evidence as uncontradicted when

17  only the defendant's testimony can contradict]; *People v. Vargas*
(1973) 9 Cal.3d 470, 475–477 [finding *Griffin* error because the

18  prosecutor said defendants did not deny being at the crime scene].)

19

20  Nonetheless, commenting on the defense's general "failure to
introduce material evidence or to call witnesses other than the

21  defendant" does not violate *Griffin*. (*People v. Taylor* (2010) 48
Cal.4th 574, 633.) If the defendant could have but did not introduce

22  evidence, the prosecutor may describe the admitted evidence as
"uncontradicted." (*People v. Johnson* (1992) 3 Cal.4th 1183, 1229

23  ["[i]f, however, the evidence could have been contradicted by
witnesses other than the defendant, the prosecutor may without

24  violating defendant's privilege against self-incrimination describe the
evidence as 'unrefuted' or 'uncontradicted'"].) If the prosecutor's

25  comments are not reasonably likely to cause the jury to infer
defendant's guilt from his failure to testify, they are constitutional.

26  (*Taylor*, at p. 633.)

27

28  Defendant argues he was unable to produce a witness to explain his

23

whereabouts because he was identified as a suspect four months after the crime was committed and no witnesses were then available. Therefore, defendant was the only one who could explain his presence near the crime, and the prosecutor's comment on his failure to do so constituted *Griffin* error by suggesting defendant should have testified in his own defense.

Defendant's recitation of the prosecutor's argument does not accurately describe the prosecutor's comments. In his rebuttal argument, the prosecutor pointed out defendant did not explain his presence near the crime scene *when he was interviewed by the police*, and instead left his counsel to provide an alternate explanation for the prosecution's evidence. The prosecutor made the following statements: "So again, you have [d]efense counsel standing up and making excuses and speculation for his own client who's already told you through the detective I wasn't there." The prosecutor continued, "[a]nd the detective shows [defendant] a picture of the business, the victim and the cell tower diagram, and points [defendant] in place and time to a particular location, and during that interview [defendant] can't offer up a maintenance McDonald's, a restaurant, a relative, a friend, anything? Nothing. He's left his counsel to get up and say [defendant's DNA was transferred to Hoa from] a gas pump or a door knob [sic]." After defendant's objection and an admonishment from the court, the prosecutor clarified he was only "commenting on [defendant's] statement to the detectives in which he denied being anywhere around."

These comments do not constitute *Griffin* error because the prosecutor was referring to defendant's failure to provide an alibi during an interview with police, not his failure to testify in his own defense at trial. As the prosecutor noted, defendant was not the only one who could testify about why he was near the crime scene. Defendant told police he was working for McDonald's at the time of the murder. Defendant could have directed investigators to a coworker or other evidence to show he was working in the area at the time of the murder; commenting on defendant's failure to do so is a permissible description of the state of the evidence under *Griffin*. (See, e.g., *People v. Brown* (2003) 31 Cal.4th 518, 554 [commenting on defendant's failure to explain his whereabouts at the time of the crime was not *Griffin* error].)

Moreover, defense counsel objected to the prosecutor's comments, and in response the prosecutor clarified he was not commenting on defendant's decision to not testify, but only on defendant's interview with police. This served to guard against the jury making an improper inference from the prosecutor's comments. (Cf. P*eople v. Taylor, supra*, 48 Cal.4th at pp. 632–633 [finding no Griffin error in part because prosecutor clarified her question]; see also *People v. Mesa*

1

2

3

4

5

> (2006) 144 Cal.App.4th 1000, 1006–1007 [stating a timely objection under *Griffin* can cure harm caused by prosecutorial misconduct].) The court also told the jury not to infer defendant's guilt from his inability to produce evidence of his alibi, further mitigating the potential for error. The prosecutor's comments in his rebuttal argument were not reasonably likely to cause the jury to infer defendant's guilt and therefore did not violate defendant's constitutional right to avoid self-incrimination.

6

(People v. Palmer, slip op. at *5-7.)

7

Legal Standards Applicable to the Claim

8

9

10

11

12

13

14

15

16

17

18

19

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself" and is applicable against the States through the Fourteenth Amendment. Malloy v. Hogan, 378 U.S. 1, 6 (1964). In Griffin v. California, the Supreme Court considered the question whether it is a violation of the Fifth and Fourteenth Amendments to invite a jury in a state criminal trial to draw an unfavorable inference from a defendant's failure to testify. There, the trial judge instructed the jury that "a defendant has a constitutional right not to testify," and that the defendant's exercise of that right "does not create a presumption of guilt or by itself warrant an inference of guilt" nor "relieve the prosecution of any of its burden of proof." However, the instruction also allowed for the jury to "take that failure into consideration as tending to indicate the truth of [the State's] evidence and as indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable." Griffin v. California, 380 U.S. 609, 610 (1965).

20

21

22

23

24

25

26

27

In Griffin, the high court set aside Griffin's conviction because "the Fifth Amendment ... forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." Griffin, 380 U.S. at 615. It held that adverse comment on a defendant's failure to testify was reminiscent of the "inquisitorial system of criminal justice" and concluded that such comment effected a court-imposed penalty upon the defendant that was unacceptable because "[i]t cuts down on the privilege by making its assertion costly." Griffin, 380 U.S. at 614 (citation omitted). "The Griffin case stands for the proposition that a defendant must pay no court-imposed price for the exercise of his constitutional privilege not to testify."

28

1    Carter v. Kentucky, 450 U.S. 288, 301 (1981).

2
> "While a direct comment about the defendant's failure to testify
> always violates *Griffin*, a prosecutor's indirect comment violates
> *Griffin* only if it is manifestly intended to call attention to the
> defendant's failure to testify, or is of such a character that the jury
> would naturally and necessarily take it to be a comment on the failure
> to testify."

3

4

5

6    Hovey v. Ayers, 458 F.3d 892, 912 (2006) (citation & internal quotations omitted).

7        The Ninth Circuit Court of Appeals has distinguished "between permissible 'comments

8    about the lack of explanation provided by the defense' and impermissible 'comments about the

9    lack of explanation furnished by the defendant.'"  Demirdjian v. Gipson, 832 F.3d 1060, 1067

10   (9th Cir. 2016) (quoting United States v. Mayans, 17 F.3d 1174, 1185 (9th Cir. 1994)).  And

11   previously, in Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir. 1987), the Ninth Circuit held a

12   prosecutor's remark can "call attention to the defendant's failure to present exculpatory evidence,"

13   so long as it is not "of such a character that the jury would naturally and necessarily take it to be a

14   comment on the failure to testify."

15       Griffin error may be harmless error.  Chapman v. California, 386 U.S. 18, 22 (1967).

16   Griffin error warrants habeas corpus relief in a § 2254 proceeding where the error has a

17   substantial and injurious effect or influence in determining the jury's verdict.  Cook v. Schriro,

18   538 F.3d 1000, 1021 (9th Cir. 2008), cert. den., 555 U.S. 1141 (2009).  And, Griffin error is not

19   harmless where the comment is extensive, an inference of guilt from silence is stressed to the jury

20   as the basis of conviction, and there is evidence that could have supported an acquittal.  Anderson

21   v. Nelson, 390 U.S. 523, 523-24 (1968) (per curiam); Cook v. Schriro, 538 F.3d at 1021.  Notably

22   too, Griffin error may be deemed harmless even in the absence of a curative instruction where the

23   comments are limited in nature and could not have affected the verdict.  Hovey v. Ayers, 458 at

24   912-13.

25                    Relevant Background

26       The prosecution gave its closing argument (ECF No. 8-4 at 141-71), followed by closing

27   argument by both defense counsel (id. at 172-85 [Blasier], 187-202 [Cameron]), and ultimately

28   rebuttal by the prosecution (id. at 202-15).  During rebuttal, the prosecution addressed a subject

raised during closing argument; that exchange is excerpted here:

> [PROSECUTOR]:  How about some more rank speculation from Mr. Cameron's closing?  Mr. Palmer's doing maintenance work for McDonalds, so therefore, his DNA gets underneath the fingernails in a hydroponics store.  So I ask you, Mr. Palmer, during your interview with the detective, where was that explanation?  When the detective says, Mr. Palmer, we need an explanation because they were getting nowhere with him because it was all denials, no, we actually need you to tell us something.  Would that not have been the time to say there's a lot of McDonalds in that area, it might have been one of the ones I was going to at that time?  No, instead he said he had no reason to be in that area.  So again, you have Defense counsel standing up and making excuses and speculation for his own client who's already told you through the detectives I wasn't there.

> Mr. Palmer's phone was in the area for one hour, 8:39 or so until 8:40 [sic].  You're telling me you're in this area for one hour, and you're accused of murder.  And the detective shows you a picture of the business, the victim and the cell tower diagram, and points you in place and time to a particular location, and during that interview you can't offer up a maintenance McDonalds, a restaurant, a relative, a friend, anything?  Nothing.  He's left his counsel to get up and say it's a gas pump or a door knob.

> MR. CAMERON: I'm going to object.

> MR. BLASIER: Improper comment with respect to the burden of proof.

> MR. CAMERON: And I mentioned the word Griffin.

> THE COURT:  Overruled with this admonition: Counsel is able to comment or argue on the other side's argument.  But again, keep in mind that the Defendant in a criminal case does not have to prove anything.    Everyone understand that?    Comments that [the prosecutor] is making are to be considered not that the Defendant didn't produce evidence, but they're offered to - - you can use them to rebut the argument from the Defense about door knobs and whatnot.  You cannot consider that for Mr. Palmer did not produce evidence. He does not have an obligation to produce evidence.  Does everyone understand that? All right.  All yeses.  All right.  Thank you.

> [PROSECUTOR]: Just to be clear, I'm commenting on Mr. Palmer's statement to the detectives in which he denied being anywhere around.  ...

(ECF No. 8-4 at 205-07.)

### Analysis

Viewed in context, the state appellate court's determination that the prosecutor's comment did not amount to Griffin error was reasonable.

27

Petitioner complains the state court's reasoning fails to account for how the jury would have interpreted the prosecutor's comments, arguing it "would naturally and necessarily take the prosecutor's argument as an improper comment on his failure to testify." (ECF No. 1 at 28.)  The undersigned disagrees.  In proper context, the prosecutor's argument was clear: he was commenting on petitioner's lack of explanation during petitioner's interview with detectives, addressing a failure to explain certain evidence.  See United States v. Rodriguez-Preciado, 399 F.3d 1118, 1132 (9th Cir. 2005) (holding that comment on the defense's failure to explain introduced testimony or evidence does not infringe on defendant's Fifth Amendment rights).  That interview was videotaped and played for the jury during the People's presentation of evidence. Petitioner's assertion that "the jury was not concerned with what petitioner said at his interrogation – they were concerned with what the trial evidence was" (ECF No. 1 at 28) is curious.  Considering the videotaped interrogation was played for the jury, it certainly amounts to "trial evidence," and there is nothing in this record to support petitioner's assertion that the jury "was not concerned with" that evidence.[8]

Notably too, the prosecutor's rebuttal argument commenced with a reference to defense counsel's own argument during closing, to wit:  "How about some more rank speculation from Mr. Cameron's closing?" and "So again, you have Defense counsel standing up and making excuses and speculation for his own client who's already told you through the detectives I wasn't there."  It is not unreasonable for a court to conclude the reference and comments that followed amounted to the prosecutor pointing out petitioner's failure to present exculpatory evidence more generally.  See United States v. Mares, 940 F.2d 455, 461 (9th Cir. 1991) ("prosecutor may comment on the defendant's failure to present exculpatory evidence, provided that the comments do not call attention to the defendant's own failure to testify"); see also United States v. Mayans, 17 F.3d at 1185-186 (same).  The prosecutor's rebuttal argument did not draw attention to

[8] The jury did request a readback of Detective Dedonder's testimony.  (ECF No. 8-1at 132-34.) Dedonder's testimony on redirect included the fact that during the interview petitioner offered no explanation for "why his phone was in that area" on that date, nor did he "offer up" any restaurants, businesses, nearby friends or relatives, he may have visited in the area on the date of the murder.  (ECF No. 8-3 at 172, 173-74.)

28

1   petitioner's silence at trial in the form of a failure to testify.

2          Petitioner contends the state appellate court's finding was illogical, that it "stretches the

3   bounds of logic." (ECF No. 1 at 28-29.)  Given the record here, the undersigned finds the state

4   court's finding reasonable as those findings included reasonable inferences from the evidence

5   proffered at trial, including petitioner's pretrial statements to law enforcement.  See, e.g., Beverly

6   v. Curry, No. C 05-2507 RMW (PR), 2008 WL 3503029, at *6-7 (N.D. Cal. Aug. 12, 2008)

7   (prosecutor's statements following "Listen to the phone calls" were comments on evidence

8   admitted at trial, not that petitioner did not testify at trial, and thus did not constitute Griffin

9   error).

10         Reviewed in context, the undersigned finds the prosecutor's comments do not amount to

11  an indirect reference to petitioner's failure to testify.  But even if those comments could be so

12  construed, the comments were not extensive nor were they "stressed" in argument to the jury as a

13  basis for petitioner's conviction.  Anderson v. Nelson, 390 U.S. at 524 (Griffin error is harmless

14  unless "such comment is extensive, where an inference of guilt from silence is stressed to the jury

15  as a basis of conviction, and where there is evidence that could have supported acquittal"); Hovey

16  v. Ayers, 485 F.3d at 911-12 (finding prosecutor's comments to be Griffin error, but concluding

17  the errors were harmless); Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993).  Here, the

18  prosecutor's comments were limited to the state of the evidence and did not stress petitioner's

19  failure to testify at trial as a basis for conviction.  At a minimum, "'fairminded jurists could

20  disagree' on the correctness of the state court's decision."  Richter, 562 U.S. at 101.

21         The jury was cautioned following the objected-to comment, as excerpted above.  And,

22  during instructions prior to deliberations, the jury was specifically instructed that "[a] Defendant

23  has an absolute constitutional right not to testify.  He or she may rely on the state of the evidence

24  and argue the People have failed to prove the charges beyond a reasonable doubt.  Do not

25  consider for any reason at all the fact that the Defendant did not testify. Do not discuss that fact

26  during your deliberations or let it influence your decision in any way."  (ECF No. 8-4 at 224-25;

27  see also ECF No. 8-1 at 190.)  The jury was also instructed: "You have heard evidence that the

28  Defendant made oral or written statements before the trial.  You must decide whether the

Defendant made any of those statements in whole or in part.  If you decide that the Defendant made such statements, consider the statements along with all the other evidence in reaching your verdict.  It is up to you to decide how much importance to give the statements.  [¶] The defendant may not be convicted of any crime based upon his out-of-court statements alone.  You may rely on the Defendant's out-of-court statements to convict him only if you first conclude that other evidence shows that the charged crime was committed.  …"  (ECF No. 8-4 at 225; see also ECF No. 8-1 at 191.)  The trial court also advised the jury that what the attorneys said was not evidence (ECF No. 8-4 at 218; see also ECF No. 8-1 at 186), and that if anything concerning the law said by the attorneys conflicted with the trial court's instructions on the law, the jury had to follow the trial court's instructions (ECF No. 8-4 at 216; see also ECF No. 8-1 at 184).  So too did it instruct on the prosecution's burden of proof.  (ECF No. 8-4 at 217-18; see also ECF No. 8-1 at 185.)  The jury is presumed to have followed the trial court's instructions.  See Weeks v. Angelone, 528 U.S. 225, 226 (2000) (jury presumed to follow judge's instructions).

Considering the foregoing, even assuming error, the undersigned concludes that petitioner has failed to show that the prosecutor's isolated comment "'had [a] substantial and injurious effect or influence in determining the jury's verdict.'"  Brecht, 507 U.S. at 637-38 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

In sum, the state appellate court's denial of petitioner's Griffin claim did not involve a decision that was contrary to, or an unreasonable application of, Supreme Court precedent.  28 U.S.C. § 2254(d).  Therefore, the undersigned recommends this claim be denied.

VI.  Conclusion

In accordance with the above, IT IS HEREBY ORDERED that the Clerk of the Court is directed to assign a district judge to this case; and

IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."    If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  November 17, 2021

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE